Johnny HODGE, Darrell Jung, and Gilda Smith, a/k/a Gilda Davis, Appellants,

v.

STATE of Indiana, Appellee.

No. 580S158.

Supreme Court of Indiana.

Dec. 14, 1982.

Ronald V. Aungst, James E. Daugherty, Daniel L. Toomey, Toomey & Woloshansky, Merrillville, for appellants.

Linley E. Pearson, Atty. Gen., Thomas D. Quigley, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

This is the direct appeal of Johnny Hodge, Darrell Jung and Gilda Smith, also known as Gilda Davis. These Appellants, together with James Herrin, Darrell Priest, Jackie Hicks and Ruby Johnson, were indicted on February 15, 1979, for the premeditated murders of Bobby Fisher and Percy McFarland. The trials of Herrin, Priest and Hicks were severed from the others on December 6, 1979. Hodge, Jung, Smith and Johnson were jointly tried by a jury of the Lake Superior Court. Hodge, Jung and Smith were each found guilty of two counts of first degree murder and were each sentenced to two life terms to be served concurrently. Johnson was convicted by the same jury of two counts of involuntary manslaughter. Her convictions have been affirmed by the Third District Court of Appeals. *Johnson v. State,* (1981) Ind.App., 423 N.E.2d 623, *trans. denied.* Although Hodge, Jung and Smith appealed individually and with separate counsel, we consolidated their cases into this one appeal. Accordingly, Hodge, Jung and Smith now collectively raise the following four issues:

1. whether the convictions of Hodge and Jung are supported by sufficient evidence and therefore are not contrary to law;

2. whether the trial court committed reversible error by granting the State's Motion in Limine thereby prohibiting the admission at trial of all evidence pertaining to certain acts of sodomy and perjury allegedly committed by the State's chief witness, Jackie Hicks;

3. whether the trial court abused its discretion by refusing to sever Jung's trial from the others; and

4. whether the trial court abused its discretion by refusing to order a new trial for Jung because of certain newly discovered evidence.

Jackie Hicks was the State's chief witness in its prosecution of Appellants Hodge, Jung and Smith. At that time, Hicks was serving a life sentence for a separate, drug-related murder. In return for his testimony, the State agreed to dismiss the charges against Hicks for the murders of Fisher and McFarland. Additionally, the State agreed to offer Hicks a reduced twelve-year sentence if Hicks' appeal of his prior murder conviction was successful and he was granted a new trial.

Hicks' testimony revealed that Johnny Hodge was the head of an organization in Gary, Indiana, which sold narcotics. Hicks was second-in-command of the organization and Jung was an "enforcer." Lester Boyd was the third-ranking gang member. Boyd was subsequently killed by being shot in his head. Ruby Johnson "cut" the organization's heroin with quinine in preparation for sale and was Hodge's "second lady." Priest and Herrin were also in the organization. Gilda Smith was not a member of Hodge's gang but would often "come around." Her boyfriend, Elijah Clark, was also accepted by the gang. Clark, like Boyd, is now dead. Bobby Fisher was head of a gang of heroin dealers which rivaled and competed against Hodge's organization. Percy McFarland likewise dealt in drugs, but neither worked for Hodge nor Fisher.

According to witness Hicks, Hodge told Hicks in late August, 1977, that Fisher had put out a "contract" for the deaths of Hodge, Hicks and Boyd. It was thereupon agreed that Hodge's organization would move against Fisher to protect itself and also to "take over Gary's narcotic underworld." The subject came up again at Sidney's Tavern in Gary on September 8, 1977. Witness Hicks and Appellant Jung were there with Priest, Herrin and Boyd. Appellant Hodge arrived at approximately 10:30 p.m. and announced that he had set Fisher up to be killed. Hodge then drove the entire group in Herrin's black Cadillac to Hodge's apartment on 13th Street, where Hodge left the group. Johnson was already at the apartment which served as the gang's headquarters. When Hodge soon returned with Clark, the group proceeded to Smith's apartment. During the trip Hodge explained that Smith was luring Fisher to her apartment by offering to sell him a machine gun. Clark unlocked the door to Smith's empty apartment using a key he possessed and the group went inside. At Hodge's suggestion, everyone found hiding places. When Smith arrived with Fisher and McFarland soon thereafter and entered the apartment, Hodge and the others came out of hiding with their guns drawn. Fisher and McFarland were frisked, stripped, bound, carried out of the apartment and placed in McFarland's car. Using both McFarland's car and Herrin's car, the group drove to Hodge's apartment. After Fisher and McFarland were carried into Hodge's apartment, Hodge instructed Johnson and Hicks to obtain some battery acid from Herrin's car and some heroin. Johnson returned from the kitchen with a foil packet containing heroin and Hicks came back with corrosion scraped from a battery terminal. As Fisher and McFarland lay on the floor at gunpoint, Smith mixed the heroin and corrosion together, added water, cooked the solution in a bottle cap using matches and drew it up into a syringe. The plan was to give the victims a "hotshot," or overdose, but apparently not enough heroin was used to kill two people. Fisher pleaded with Hodge from the floor, but Hodge said:

> "You think you the Godfather. I know about the hit that you have, but you think you the Godfather, but I'm the gangster."

Smith then inserted her syringe into Fisher's arm and hit a vein. As Smith injected Fisher, she reminded him that he had previously raped her and another person. Fisher struggled and had to be restrained by two or three of the gang. According to Hicks, the needle might have gone through Fisher's vein due to his struggling. After Smith finished the injection, Hodge hit Fisher in his face many times causing his nose to bleed. Smith next prepared an injection for McFarland. McFarland asked Hodge why he was being treated like Fisher, and then rhetorically answered: "I was in the wrong place at the wrong time."

Hodge agreed. As Smith injected the heroin-acid solution into McFarland's arm, McFarland did not struggle very much. After McFarland was injected, a friend of several of the gang members, Lewis Pride, arrived at Hodge's apartment. Fisher and McFarland were taken into a bedroom to prevent Pride from seeing them. Johnson, Herrin and Hodge remained in the living room and talked with Pride for approximately fifteen minutes, after which Pride left. Hodge then instructed the group to obtain some rope or cord. Using an electrical cord, different members of the gang attempted for several minutes to strangle the victims but were unable to kill them because the cord stretched. The two victims choked and their tongues protruded, however, as they became semi-conscious. Having twice failed to kill Fisher and McFarland, Hodge ordered that the victims be carried outside and put into McFarland's car. Hodge further ordered Johnson, Herrin and Smith to remain at the apartment to clean up the blood and excrement which was left on the couch and floor by the victims. After both of the victims were gagged, they were carried away and put on the rear floor area of McFarland's car. Again using both Herrin's car and McFarland's car, the group drove to a location along Martin Luther King Drive in Gary where the cars were parked. Hicks, Jung, Priest and Boyd wiped off the fingerprints in McFarland's car. Hodge then went to McFarland's car, opened the driver's side door and fired five shots into the victims thereby killing them. When the victims were found, they were lying partially clothed on the back seat and floor of McFarland's parked automobile. McFarland was found with an electrical cord wrapped around his neck. Although there was nothing around Fisher's neck, a piece of cord was found beneath his head.

I

■ Appellants Hodge and Jung claim that there is insufficient evidence to support their convictions. Specifically, they contend that the State's chief witness, Jackie Hicks, was not credible because of the plea bargain he received in exchange for his testimony and because of the disparity between his testimony and certain medical evidence admitted at trial. These are not, however, proper matters for this Court to consider on appeal. *Pavone v. State,* (1980) Ind., 402 N.E.2d 976, 981, *reh. denied; Bond v. State,* (1980) Ind., 403 N.E.2d 812, 819, *reh. denied.* As we held in *Logsdon v. State,* (1980) Ind., 413 N.E.2d 249, 251:

"The resolution of a conflict in the evidence is a function for the jury and is not a proper consideration for this Court."

Accordingly, we will not disturb the jury's judgment unless the evidence clearly shows that the jury's verdict was so incredible as to be beyond belief or that there was no probative evidence from which the jury could find the defendant guilty beyond a reasonable doubt. Neither is true of the evidence in this case.

■ At trial, there was introduced medical evidence which did not corroborate certain of the particulars in Hicks' testimony. Specifically, the reports on the autopsies of Fisher and McFarland contained no reference to any injection marks on either victim. The autopsy reports also did not state that the blood of either of the victims indicated the injection of heroin to the extent that might be expected according to Hicks' testimony. Furthermore, the autopsy reports did not indicate that the necks of the victims showed signs of the serious strangulation attempt which Hicks described. Completely reviewing the record of this case, however, we find merit in the State's contention that this medical testimony is indicative of two poorly performed autopsies. We find it possible that because these deaths were so obviously caused by the self-evident gunshot wounds, those performing these autopsies negligently failed to thoroughly examine the bodies and copiously note any and all marks found as is done in a proper autopsy. Aside from the evidence which is argued to suggest the alleged conflicts in Hicks' testimony, there was substantial evidence which largely corroborated Hicks' testimony. This other evidence included, for example, proof that the

death causing bullets were shot into the left side of the victims' heads giving credence to the claim that they were shot from the driver's side of McFarland's car. Also, the murder weapon was ballistically traced to Hodge. In conclusion, we find that there was ample evidence from which the jury could find beyond a reasonable doubt that these Appellants did, in fact, commit the two murders as charged.

## II

Each of the Appellants now challenge the trial court's grant of the State's Motion in Limine. The Motion consisted of two parts. The first part prevented admission of any evidence pertaining to alleged inconsistencies between Hicks' testimony at his prior murder trial and a statement he tendered to the police after his conviction. The second part of the Motion excluded any evidence concerning a sexual attack Hicks allegedly made on another prisoner in the Porter County Jail.

Hicks was tried on an unrelated murder charge along with Appellant Hodge in Porter County. Testifying in his own behalf, Hicks presented an alibi defense and denied involvement in that murder. After Hodge and Hicks were convicted, Hicks recanted and admitted to the police that he had been involved. He further admitted to the same police officers that he had been involved in the murders of Fisher and McFarland. In exchange for his testimony in these instant cases, the State agreed not to prosecute Hicks for the murders of Fisher and McFarland.

▰▰▰▰ A challenge to a trial court's ruling on a motion in limine generally presents nothing for us to review. The function of a motion in limine is to keep potentially prejudicial information from being presented to the jury until after the trial court has ruled upon its admissibility within the context of the trial itself. *Baker v. State*, (1981) Ind., 425 N.E.2d 98, 101; *Inman v. State*, (1979) Ind., 393 N.E.2d 767, 769. Error must, therefore, be alleged specifically with respect to the trial court's actual exclusion of evidence offered to be produced at trial.

Appellants did attempt to offer evidence proscribed by the State's Motion in Limine and they now claim that the trial court improperly enforced the Motion with regard to their excluded evidence. The contested evidence pertained to the perjury and sodomy allegedly committed by Hicks in Porter County. In fact, the Porter County Prosecutor never filed any perjury or sodomy charges against Hicks. Appellants contend that these charges were not filed as part of Hicks' agreement to testify for the State in the instant cases. This argument is made to suggest that Hicks' testimony was both biased and incredible. We find absolutely no evidence in the record which supports Appellants' contention that the Porter County Prosecutor withheld charges against Hicks pending Hicks' contrived cooperation in the instant Lake County prosecutions. Absent such evidence, we find Appellants merely speculating as to the circumstances behind the decision to not prosecute Hicks for perjury and sodomy. To determine whether there were grounds for charging Hicks with perjury and sodomy and then to further determine that the State withheld such prosecutions as part of a plea bargain arrangement simply amounts to trying other cases within this proceeding, which we will not allow. *See Bivins v. State*, (1970) 254 Ind. 184, 190, 258 N.E.2d 644, 647, *reh. denied.*

As the trial court noted when ruling on the State's Motion in Limine, the jury already knew that Witness Hicks received immunity from prosecution for the murders of Fisher and McFarland in exchange for his testimony against Appellants. The jury also knew that Hicks bargained for the possibility of receiving a reduced sentence for his prior murder conviction. We find unconvincing Appellants' contention that granting Hicks immunity from prosecution for two additional charges substantially increased Hicks' motive for testifying in these cases. Further, we are not convinced that the jury would doubt Hicks' credibility or his view of the witness oath solely on the chance that Hicks changed his testimony in order to better bargain for immunity from

possible sodomy and perjury charges in another county.

A witness may not be impeached by proof of particular extraneous acts of misconduct which are not reduced to convictions. *Chambers v. State,* (1979) Ind., 392 N.E.2d 1156, 1160. Moreover, the general credibility of a witness ordinarily may be attacked only by showing that the witness has been convicted of treason, murder, rape, arson, burglary, robbery, kidnapping, forgery, perjury or other crime involving dishonesty or false statement. *Daniels v. State,* (1980) Ind., 408 N.E.2d 1244, 1246; *Mitchell v. State,* (1979) Ind., 398 N.E.2d 1254, 1258, reh. denied (1980). Hicks had not been convicted of perjury in Porter County at the time of the instant proceeding. In fact, the record contains no direct evidence which indicates that Hicks could even have been so charged. As for the alleged sodomy, the fact that Hicks had been accused of sexually attacking another prisoner came out during Hicks' cross-examination. Under the facts and circumstances of these cases, we find that the trial court did not err by excluding the contested testimony according to the State's Motion in Limine.

### III

Appellant Jung argues that the trial court erred by refusing to sever his trial from the trial of his co-defendants. He concedes that he had no statutory right to a separate trial but contends that the trial court abused its discretion by denying his Motion for Severance. The trial court clearly possessed the discretionary power to determine whether or not it was necessary to grant Jung a separate trial in order to promote a fair determination of his guilt or innocence. Ind.Code § 35–3.1–1–11(b) (Burns 1979); *see also:* Ind.Code § 35–34–1–11(b) (Burns Supp.1982). The decision of the trial court is, therefore, reviewable only for an abuse of that discretion. *Scott v. State,* (1981) Ind., 425 N.E.2d 637, 638; *Jones v. State,* (1981) Ind., 421 N.E.2d 643, 645. To determine whether the trial court abused its discretion, we will consider only

what transpired at trial and not what was alleged in the Motion for Severance. *Chandler v. State,* (1981) Ind., 419 N.E.2d 142, 149; *Ortiz v. State,* (1976) 265 Ind. 549, 561, 356 N.E.2d 1188, 1195. As the Court of Appeals pointed out:

"A defendant is not entitled to a separate trial as a matter of right merely because damaging evidence of the actions of a co-defendant reflects, by implication, on her, since there is no constitutional right to be protected from damaging evidence."

*Johnson v. State,* 423 N.E.2d at 629.

A review of the evidence before us clearly shows that Jung was not unduly prejudiced by the trial court's refusal to sever his trial from the trial of his co-defendants. Specifically, we find that the same evidence introduced in the instant proceeding to demonstrate Jung's participation in the murders of Fisher and McFarland would have been admissible in a separate trial. Such evidence included testimony that: Jung was an "enforcer" in Appellant Hodge's narcotics organization; Jung was present on September 8, 1977, when members of Hodge's organization discussed killing Fisher; Jung aided in moving Fisher and McFarland from Appellant Smith's apartment to Appellant Hodge's apartment; Jung helped to conceal the victims during the visit of Pride; Jung joined in an effort to choke the victims; Jung carried Fisher to McFarland's car; Jung drove McFarland's car with Fisher therein to the scene of the killings; and Jung wiped fingerprints from McFarland's car after the murders. Finding no showing of the prejudice required to prove an abuse of trial court discretion, we hold that the trial court did not err by refusing to grant Jung's Motion for Severance.

### IV

Finally, Appellant Jung claims that the trial court committed reversible error by refusing to grant him a new trial based on his presentation of certain newly discovered evidence. The newly discovered evidence consisted of Richard Deadwiler's confession that he and Lester Boyd killed Fisher and

McFarland. Deadwiler made his confession when called by Jung to testify with respect to Jung's Motion to Correct Errors. Deadwiler testified that Boyd suggested to him that they make some "easy money" by robbing and killing Bobby Fisher. Deadwiler said the killings occurred at Boyd's apartment located on the second floor of the building containing Sidney's Tavern. At the time of Deadwiler's confession to the trial court, Lester Boyd was dead.

Deadwiler's confession was confused and did not comport with the facts established during the trial of these cases. Deadwiler testified that Fisher and McFarland were shot on the right sides of their heads when the evidence clearly showed that they were shot on the left. Deadwiler also testified that the corposes were carried downstairs, through Boyd's back door and placed into an automobile parked in an adjacent alley. Actually, Boyd's apartment was on the first floor of a building which did not contain Sidney's Tavern and his back door did not lead into an alley. Other evidence showed that even if Deadwiler had been correct in his location of Boyd's apartment, his testimony was still internally inconsistent because anyone leaving from the rooms above Sidney's by a back door would have to exit through Sidney's. During cross-examination, Deadwiler could not identify Boyd from a photograph taken just four months before the murders and was further unable to identify "mug shots" of both Fisher and McFarland. In fact, Deadwiler selected a photograph of McFarland and identified it as picturing Boyd, his purported accomplice.

 The trial judge heard all of the evidence in this proceeding including Deadwiler's testimony. After considering all of the evidence, he found Deadwiler's confession to be so incredible as to be unworthy of belief. The trial judge specifically found that Deadwiler's testimony was "pure fabrication" and that a jury would completely discount his testimony. Citing *Emerson v. State*, (1972) 259 Ind. 399, 287 N.E.2d 867, the trial judge accordingly denied Jung's Motion to Correct Errors ruling that the evidence adduced through Deadwiler was

not worthy of credit and probably would not produce a different result. Having examined the record of this proceeding, we find no abuse of discretion in the trial judge's determination of this issue.

The trial court is in all things affirmed.

GIVAN, C.J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.